UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CLEAN FUELS DEVELOPMENT COALITION, MINNESOTA SOYBEAN GROWERS ASSOCIATION, ICM, INC., MINNESOTA SERVICE STATION & CONVENIENCE STORE ASSOCIATION, and NATIONAL ASSOCIATION OF CONVENIENCE STORES, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| KATRINA KESSLER, in her official capacity as Commissioner of the MINNESOTA POLLUTION CONTROL AGENCY (MPCA); PETER TESTER, in his official capacity as Deputy Commissioner of MPCA; FRANK KOHLASCH, in his official capacity as Assistant Commissioner of MPCA; KIRK KOUDELKA, in his official capacity as Assistant Commissioner of MPCA; DANA VANDERBOSCH, in her official capacity as Assistant Commissioner of MPCA; and TIMOTHY J. WALZ, in his official capacity as Governor of the State of Minnesota, | **COMPLAINT** |
| Defendants. | |

Plaintiffs Clean Fuels Development Coalition, Minnesota Soybean Growers

Association, ICM, Inc., Minnesota Service Station & Convenience Store Association, and

National Association of Convenience Stores bring this action for declaratory and injunctive relief against Defendants and state as follows:

## **INTRODUCTION**

1.      This suit challenges new rules issued by the Minnesota Pollution Control Agency (MPCA) governing motor-vehicle carbon-dioxide emissions—rules that MPCA has admitted require automakers to increase the fuel economy of their fleets.

2.      Specifically, this action challenges MPCA's new rules (1) imposing Low Emission Vehicle (LEV) carbon-dioxide emission limits; and (2) mandating a sales quota for Zero Emission Vehicles (ZEVs).[1]

3.      The carbon-dioxide rules require automakers to deliver for sale in Minnesota only passenger cars, light-duty trucks, and medium-duty vehicles that are certified as meeting the LEV standard for carbon-dioxide emissions.

4.      Manufacturers must also meet average carbon-dioxide emission requirements for the entire fleet of vehicles they deliver for sale in Minnesota, along with separate fleetwide emission standards for each vehicle category.

---

[1] The term "zero emission vehicle" tracks the language in the challenged regulations. But it is a misnomer: generating electricity to power electric vehicles creates greenhouse gases, and "[s]ome studies have shown that making a typical EV [electric vehicle] can create more carbon pollution than making a gasoline car" due to "the additional energy required to manufacture an EV's battery." EPA, *Electric Vehicle Myths* (Mar. 1, 2023), https://www.epa.gov/greenvehicles/electric-vehicle-myths; *see, e.g.*, Jasper Juinen, *Germany's Dirty Green Cars*, WSJ (Apr. 23, 2019, 6:16 P.M.), https://www.wsj.com/articles/germanys-dirty-green-cars-11556057770 (discussing study by IFO think tank in Munich finding that "the diesel Mercedes [C220d sedan] releases about 141 grams of carbon dioxide per kilometer driven, including the carbon emitted to drill, refine and transport the fuel," compared to "[b]etween 156 and 181 grams" for the "Tesla Model 3").

5.     The ZEV mandate, meanwhile, requires a certain percentage of the cars and light-duty trucks that each automobile manufacturer delivers for sale in Minnesota each year to be vehicles with zero tailpipe emissions—a quota and *de facto* mandate requiring battery electric vehicles.

6.     Though these new rules will apply in Minnesota, imposing considerable costs on nearly every facet of the transportation industry and citizens across the State, neither the Minnesota Legislature nor MPCA had any hand in drafting them.

7.     Instead, MPCA "incorporated by reference" over 45 provisions of the California Code of Regulations that regulate vehicle emissions, simply noting that the term "Minnesota" should be "substitut[ed]" for "California." Minn. R. 7023.0150, subp. 2–3; *see* Minn. Pollution Control Agency, *Statement of Need and Reasonableness; Proposed Revisions to Minnesota Rules, Chapter 7023, Adopting Vehicle Greenhouse Gas Emissions Standards (Clean Cars Minnesota)* ("SONAR") at 40 (Dec. 2020) ("MPCA is proposing to use incorporation by reference to adopt California's LEV and ZEV standards.").

8.     Federal law and the Constitution stand in the way of this scheme. MPCA's (and California's) LEV carbon-dioxide standard and ZEV mandate are preempted by both the Energy Policy and Conservation Act (EPCA) and the Clean Air Act (CAA).

9.     The carbon-dioxide standard and the ZEV mandate are expressly preempted by EPCA, 49 U.S.C. § 32901 *et seq.*, because both are "related to" fuel-economy standards.

10.     In EPCA, Congress directed the National Highway Traffic Safety Administration (NHTSA) to set national fuel-economy standards through the Corporate Average Fuel Economy (CAFE) program.

11.     Congress instructed NHTSA to establish these uniform national fuel-economy standards at the "maximum feasible" level, *id.* § 32902(a), after considering four enumerated statutory factors: "technological feasibility," "economic practicability," "the effect of other motor vehicle standards of the Government," and "the need of the United States to conserve energy," *id.* § 32902(f).

12.     Leaving no doubt about its intent to establish a "single standard" for regulating fuel economy, S. Rep. No. 93-526 at 59 (1973), Congress included an express preemption provision with the broadest possible language, forbidding any "State or a political subdivision of a State" to "adopt or enforce a law or regulation *related to* fuel economy standards or average fuel economy standards," 49 U.S.C. § 32919(a) (emphasis added).

13.     MPCA's incorporated-from-California rules fall squarely within EPCA's preemption provision because they directly and substantially affect fuel economy.

14.     MPCA's LEV rules limit tailpipe carbon-dioxide emissions. And tailpipe carbon-dioxide emissions and fuel economy are two sides of the same coin because there is a direct, scientific, and mathematical relationship between tailpipe carbon-dioxide emissions and fuel economy—the greater a vehicle's fuel economy, the fewer grams of carbon dioxide it will emit per mile, and vice versa.

15.     Thus, "any rule that limits tailpipe $CO_2$ emissions is effectively identical to a rule that limits fuel consumption." *Delta Const. Co. v. EPA*., 783 F.3d 1291, 1294 (D.C. Cir. 2015) (per curiam) (quoting 76 Fed. Reg. 57,106, 57,124–25 (Sept. 15, 2011)).

16.     Indeed, the connection between the two is so strong that the Environmental Protection Agency (EPA), at Congress's direction, has long calculated vehicles' fuel economy by measuring their carbon-dioxide emissions and plugging those numbers into a mathematical formula. *See* 49 U.S.C. § 32904(c); H.R. Rep. No. 94-340 at 92 (1975) (discussing the relationship between "[f]uel economy tests" and "emissions tests conducted under the Clean Air Act"); 38 Fed. Reg. 10,868 (May 2, 1973); 40 C.F.R. § 600.113-12(h).

17.     MPCA, too, has acknowledged this direct and substantial relationship, explaining that "[t]he primary way manufacturers reduce [greenhouse gas] emissions to comply" with MPCA's new LEV carbon-dioxide standards "is to *improve the fuel economy of their vehicles*." SONAR at 72 (emphasis added).

18.     In short, state regulations of tailpipe carbon-dioxide emissions are not just "related to" fuel-economy standards—they are a *de facto* regulation of fuel economy. As such, they are expressly preempted by EPCA.

19.     MPCA's new carbon-dioxide standards also are impliedly preempted by EPCA because they interfere with Congress's determination that NHTSA set nationally uniform fuel-economy standards at the "maximum feasible" level. 49 U.S.C. § 32902(a).

20.     This charge to NHTSA leaves no room for state officials to reweigh the statutory factors in § 32909(f), or consider other factors of their own choosing, and reach their own conclusions as to what the "maximum feasible" standard should be.

21.     By requiring automakers to achieve a fuel economy that differs from the "maximum feasible" fuel economy established by NHTSA, state regulations related to fuel

economy—regardless of their purported purpose—undermine NHTSA's balancing of the statutory factors in establishing nationwide fuel-economy standards.

22.     Accordingly, MPCA's LEV rules imposing carbon-dioxide emission limits stand as an obstacle to Congress's objective: to create a single nationwide fuel-economy standard at the "maximum feasible" level, as determined by NHTSA.

23.     These conclusions apply equally to state ZEV mandates. Like carbon-dioxide limits, state ZEV mandates are both expressly and impliedly preempted by EPCA.

24.     In EPCA, Congress expressly forbade NHTSA to consider the fuel economy of vehicles that run on "alternative fuels" (such as electricity) in setting fuel-economy standards. 49 U.S.C. § 32902(h)(1); *id.* § 32901(a)(1)(J).

25.     In this way, Congress prevented NHTSA from effectively mandating ZEVs by setting standards so stringent that they can be met only by producing such vehicles.

26.     At the same time, Congress created an incentive for ZEVs, such as electric vehicles, by allowing manufacturers to include their fuel economy, based on petroleum-equivalent values, in calculating the average fuel economy of their fleets for purposes of *complying* with fuel-economy standards. *See id.* § 32904(a)(2).

27.     Thus, state ZEV mandates, like MPCA's here (and California's), are expressly preempted because they "relate to" fuel-economy standards—if they did not, Congress would not have expressly addressed ZEVs in EPCA.

28.     MPCA's new rules mandating ZEVs are also impliedly preempted because they nullify Congress's rejection of ZEV mandates and interfere with NHTSA's balancing of the statutory factors in establishing the "maximum feasible" fuel-economy standards.

29.     MPCA cannot evade EPCA preemption by relying on provisions of the CAA that exempt certain state emission standards from preemption under the CAA.

30.     Like EPCA, the CAA contains a broadly worded express preemption provision: Section 209(a) of the CAA expressly forbids states to "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines*." 42 U.S.C. § 7543(a).

31.     Unlike EPCA, Section 209(b) of the CAA authorizes EPA to waive CAA preemption for California—and only California—on certain conditions. *Id.* § 7543(b).

32.     Section 177 of the CAA, in turn, authorizes other states to adopt motor-vehicle emission standards identical to the California standards for which EPA has granted a waiver from CAA preemption under Section 209(b). *See id.* § 7507.

33.     These provisions of the CAA do not and cannot exempt MPCA's new rules from preemption under EPCA. Section 209(b) authorizes EPA to waive only "*this section*," *i.e.*, Section 209 of the CAA. *Id.* § 7543(b). Neither the CAA nor any other law authorizes EPA or any other agency to waive preemption under EPCA.

34.     Indeed, in waiving CAA preemption for the California standards that MPCA has now adopted for Minnesota, EPA expressly declined to consider EPCA preemption, expressing no view as to whether the standards are "related to" fuel-economy standards or interfere with NHTSA's balancing of the statutory factors.

35.     As EPA has explained, "[c]hallenges based on preemption under EPCA" are appropriately addressed "in court." 87 Fed. Reg. 14,332, 14,373 (Mar. 14, 2022).

36.     In any event, even apart from EPCA, MPCA's new rules cannot stand because the CAA's preemption exemption scheme—whereby Congress granted a one-of-a-kind preemption exemption to California, while requiring all other states to abide by either federal motor-vehicle emission standards or California's—is unconstitutional.

37.     Under the equal-sovereignty doctrine, Congress may not selectively grant a core attribute of state sovereignty—here, a state's authority to enact and enforce laws promoting the health and welfare of its citizens—to favored states and withhold it from similarly situated but disfavored states.

38.     Yet in Section 209(b) of the CAA, Congress did just that, authorizing EPA to waive CAA preemption—but only for California. In other words, Congress granted just one state—California—a special privilege to enact and enforce laws to address "compelling and extraordinary conditions" within its borders, leaving all other states powerless to set their own standards, even if they face the same or similar conditions as California or other "compelling and extraordinary conditions" of their own.

39.     This violates "the fundamental principle of equality of the states under the Constitution." *Bolln v. Nebraska*, 176 U.S. 83, 89 (1900). The mere "idea that one State is debarred [by Congress], while others are granted, the privilege of amending their organic laws to conform to the wishes of their inhabitants, is so repugnant to the theory of their equality under the Constitution, that it cannot be entertained." *Id.*

40.     Congress may not, consistent with the Constitution, grant more regulatory authority or capacity for self-government to one state than to others.

41.     Because Section 209(b) violates this bedrock constitutional principle, both it and Section 177 are void of force and effect.

42.     As a result, both California's standards and MPCA's new rules purporting to adopt those standards—like all other state motor-vehicle emission standards—are expressly preempted by CAA Section 209(a).

43.     In sum, Minnesota has now joined a band of states that have sought to use CAA Sections 209(b) and 177 as a loophole to circumvent EPCA preemption.

44.     But an exemption from preemption under the CAA does not shield state standards relating to fuel economy from preemption under EPCA or permit states to upend Congress's uniform national approach to regulating fuel economy.

45.     The CAA itself, moreover, cannot authorize MPCA's rules because its preemption exemption provisions improperly privilege California over other States in violation of the constitutional equal-sovereignty doctrine.

46.     MPCA's new rules are thus preempted by both EPCA and the CAA, and must be enjoined.

## **PARTIES**

47.     Plaintiff Clean Fuels Development Coalition (CFDC) is a business league organization established in 1988. CFDC works with auto, agriculture, and biofuel interests in support of a broad range of energy and environmental programs to advance human health and well-being, environmental quality, and American agriculture.

48.     Plaintiff Minnesota Soybean Growers Association (MSGA) is a non-profit, farmer-controlled advocacy organization that works on behalf of Minnesota's soybean farmers to promote farm-friendly policies.

49.     Plaintiff ICM, Inc. (ICM) is a Kansas corporation and a global leader in developing biorefining capabilities, especially for the production of ethanol. ICM has designed over 100 ethanol plants currently in service, and plants using ICM technology collectively produce some 8.8 billion gallons of ethanol annually—approximately one-third of the world's ethanol production.

50.     Plaintiff Minnesota Service Station & Convenience Store Association (MSSA) is a trade organization founded in 1966 that advocates for the interests of Minnesota's independent service station owners and automotive repair facilities.

51.     Plaintiff National Association of Convenience Stores (NACS) is a global trade association headquartered in Alexandria, Virginia, that represents more than 1,300 retail and 1,600 supplier company members, providing industry-leading research and analysis, networking and education opportunities, and advocacy to ensure the competitive viability of its member businesses.

52.     Defendant Katrina Kessler is a citizen of Minnesota. Kessler serves as Commissioner of MPCA and is sued in her official capacity.

53.     Defendant Peter Tester is a citizen of Minnesota. Tester serves as Deputy Commissioner of MPCA and is sued in his official capacity.

54.     Defendant Frank Kohlasch is a citizen of Minnesota. Kohlasch serves as Assistant Commissioner of MPCA and is sued in his official capacity.

55.     Defendant Kirk Koudelka is a citizen of Minnesota. Koudelka serves as Assistant Commissioner of MPCA and is sued in his official capacity.

56.     Defendant Dana Vanderbosch is a citizen of Minnesota. Vanderbosch serves as Assistant Commissioner of MPCA and is sued in his official capacity.

57.     Defendant Timothy J. Walz is a citizen of Minnesota. Walz serves as Governor of the State of Minnesota and is sued in his official capacity.

## JURISDICTION AND VENUE

58.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this case arises under the Constitution and laws of the United States.

59.     This Court has authority under 42 U.S.C. § 1983 and the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), to enjoin enforcement of MPCA's rules, and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

60.     Venue is proper in this district under 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and all Defendants are residents of Minnesota, and because the challenged rules were adopted in this district and will be enforced by each Defendant in the course of the performance of his or her official duties in this district.

## STANDING

61.     Plaintiffs have standing to challenge MPCA's rules because they and their members face concrete, particularized, and imminent injuries that are caused by the adoption and enforcement of MPCA's rules and that are redressable by a court order declaring those rules unlawful and enjoining their enforcement.

62.     MPCA's new rules are designed to reduce consumption of liquid fuel in Minnesota by forcing automakers to produce and sell more vehicles that use less (or no) liquid fuel than consumers would demand absent regulatory intervention.

63.     MPCA readily admits that its rules will significantly reduce the demand for gasoline and diesel fuels. *See* SONAR at 63–64. Indeed, MPCA projects "a reduction of approximately 700 million gallons of gasoline purchased by Minnesotans" over the first 10 years of implementation. *Id.* at 65.

64.     By requiring automakers to produce and deliver for sale in Minnesota vehicles that consume less or no liquid fuel, MPCA's new rules depress the demand for liquid fuel in Minnesota and thereby inflict a direct financial injury on businesses that produce and sell liquid fuels in the State, as well as on related businesses.

65.     Injuries to Minnesota businesses are inevitable because automakers either already have finalized, or will imminently finalize, their production and sales plans for their model year 2025 vehicles that are subject to MPCA's new rules.

66.     A favorable decision would nevertheless provide significant redress by eliminating the market-distorting effects of MPCA's rules going forward.

67.     Among those injured by MPCA's new rules are Plaintiff MSGA's members, which include more than 2,600 Minnesota soybean farmers.

68.     Soybeans grown by MSGA members are used as a feedstock for the production of 85 million gallons of biodiesel annually, a significant portion of which is sold for use in Minnesota.

69.     MSGA's members therefore face imminent injury in the form of lost sales of soybeans that would otherwise be used to make diesel fuels for use in Minnesota vehicles.

70.     MSGA has associational standing to bring this suit on behalf of its members because (1) its members have standing to sue in their own right based on the injuries just described; (2) the interests MSGA seeks to protect are germane to its organizational purpose, which includes advocacy to ensure the competitive viability of its member businesses; and (3) neither the claims asserted nor the relief requested requires the participation of any individual members.

71.     MPCA's rules also injure Plaintiff ICM by reducing the demand for ethanol and therefore decreasing demand for ICM's products and services.

72.     As noted, MPCA projects that its new rules will cause "a reduction of approximately 700 million gallons of gasoline purchased by Minnesotans" over the first 10 years of implementation. SONAR at 65. An average of 12% of each gallon of gasoline sold in Minnesota is ethanol. Under MPCA's projections, then, these new rules will result in a reduction of over 84 million gallons of ethanol purchased in Minnesota.

73.     A significant percentage of the ethanol currently sold in Minnesota is manufactured in plants designed, built, maintained, and/or retrofitted by ICM.

74.     MPCA's rules will thus decrease the demand for all aspects of ICM's products and services, including new ethanol plant design, construction, maintenance, service, and retrofitting.

75.     Minnesota service stations, too, face imminent financial injury from MPCA's rules. These service stations include members of MSSA, such as Bona Companies Inc.,

and Ralphie's Minnoco; and members of NACS, such as Bobby's & Steve's Auto World and 36 Lyn Refuel Station, as well as hundreds of Kwik Trip outlets throughout the State.

76.     MSSA's and NACS's Minnesota service station members will be injured by lost fuel sales. They sell large volumes of gasoline (that include ethanol) and diesel fuels (including biodiesel), the demand for which will be reduced by MPCA's rules.

77.     For example, in 2022 MSSA member Bona Companies Inc. sold approximately 1 million gallons of liquid fuel; MSSA member Ralphie's Minnoco sold approximately 1.8 million gallons; MSSA member Rod's Country Corner Inc. sold approximately 0.8 million gallons; and MSSA member Youngstedt Inc. sold approximately 0.95 million gallons. Of these sales, approximately 56 percent, 40 percent, 31 percent, and 38 percent, respectively, were sales of higher-ethanol blends.

78.     Additionally, many members have made significant investments in liquid fuel infrastructure. For example, MSSA member Bona Companies Inc. recently invested more than $200,000 to install new blender pumps capable of providing low-carbon, higher-ethanol blends. The value of these investments will be diminished MPCA's actions.

79.     MSSA's and NACS's service station members will also be financially injured because drivers who refuel less often (or not at all) will less frequently patronize their convenience stores, which in turn will cause decreased sales of food, beverages, medications, automotive products, lottery tickets, and other convenience-store staples.

80.     These service stations will also face injury due to the costs associated with adapting to new consumer needs based on these rules in order to remain competitive,

including the costs of training staff and the costs to establish plug-in chargers to meet the artificial consumer demand created by these rules.

81.     Some service stations have installed or are currently installing electric-vehicle chargers and thus are, or will soon be, selling electricity to drivers. But these sales do not, and will not, make up for lost sales of gasoline and diesel fuels.

82.     This is due in part to the fact that these market changes—especially at this pace—are driven not by consumer demand, but by government mandate.

83.     It is also due to the fact that "[m]any EV owners are able to meet their daily driving range requirements by charging overnight with Level 1 equipment [a standard 120-volt outlet], requiring no additional cost or installation."[2]

84.     MPCA, too, has recognized that "most EV owners will recharge their vehicles overnight at their home." MPCA, *Charging While You Work* 1 (Dec. 2012).[3] MPCA has noted that research shows "about 80 percent of charging by EV owners is taking place at home." *Id.* "Unlike the 115,000 or so gas stations in the U.S. that are fueling most of our vehicles today," MPCA has explained, "there are tens of millions of households

---

[2] Alternative Fuels Data Center, *Charging Electric Vehicles at Home*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/fuels/electricity_charging_home.html; *see also* EPA, *Electric Vehicle Myths*, https://www.epa.gov/greenvehicles/electric-vehicle-myths (same); Drive Electric Minnesota, *Charging Electric Vehicles 101*, https://driveelectricmn.org/charging/ (last visited Mar. 2, 2023) (explaining that Minnesotans can charge their electric vehicles with "no extra equipment or installation" by "plugging into a standard 120-volt outlet" or by "plugging into a 240-volt outlet (the same kind that power appliances like dryers)").

[3] https://www.pca.state.mn.us/sites/default/files/charging-while-you-work-guide.pdf.

across the country that are suitable today to charge and provide 'fuel' for electric vehicles."
*Id.*

85.    Thus, even with increasing sales of electricity, MSSA's and NACS's members will suffer financial loss as a result of MPCA's rules.

86.    Indeed, many of MSSA's and NACS's members have not installed, and have no plans to install, charging stations—for these members, there is no good business case justifying such investments.

87.    Finally, MSSA's membership includes many independent automobile repair and maintenance shops in the State. These shops service cars and trucks powered by internal combustion engines, including through routine work such as oil changes; most do not perform any work on electric vehicles, which generally require less frequent (and less labor-intensive) service and maintenance than conventional vehicles, and are often much more difficult to supply with replacement parts. Indeed, in some cases, electric vehicle manufacturers *prohibit* third-party shops from servicing their electric vehicles.

88.    For example, MSSA member Youngstedt, Inc. provides full-service auto-repair at 10 locations with 80 service bays and just under 200 employees, and MSSA member Bona Companies Inc. provides similar services at 2 locations with 39 employees. Both companies report performing far fewer repairs on electric vehicles than on conventional vehicles, except for tires and wipers.

89.    Consequently, the demand for these members' repair services will decrease with MPCA's quota for increasing market penetrations of electric vehicles.

90.     MSSA and NACS each have associational standing to bring suit this on behalf of their respective members because (1) their members have standing to sue in their own right based on the injuries just described; (2) the interests MSSA and NACS seek to protect are germane to their organizational purposes, which include advocacy to ensure the competitive viability of their member businesses; and (3) neither the claims asserted nor the relief requested requires the participation of any individual members.

## STATEMENT OF FACTS

### *Federal Law Background*

91.     Two federal statutes—EPCA and the CAA—work together to establish a unified national regulatory program for motor-vehicle fuel economy and motor-vehicle emissions, respectively. Each statute is backed by an express preemption provision, and each preempts MPCA's new rules.

92.     Congress passed EPCA in 1975 to establish a "single standard" for motor-vehicle fuel economy. S. Rep. No. 93-526 at 59 (1973).

93.     Congress directed NHTSA, exercising authority delegated from the Secretary of Transportation, to set national fuel-economy standards through the CAFE program. *See* 49 U.S.C. § 322(a), (b).

94.     The federal fuel-economy standards do not apply to individual vehicles or models. Rather, they regulate the fuel economy of each manufacturer's entire fleet of cars and trucks, on a fleetwide-average basis. As a result, a manufacturer can produce and sell any combination of vehicles that the market will bear, so long as the fuel economy of its fleet as a whole meets or exceeds the standards set by NHTSA.

95.     Congress instructed NHTSA to establish these uniform national fuel-economy standards at the "maximum feasible" level, *id.* § 32902(a), after considering four enumerated statutory factors: "technological feasibility," "economic practicability," "the effect of other motor vehicle standards of the Government," and "the need of the United States to conserve energy," *id.* § 32902(f).

96.     In considering these factors and determining the appropriate standards, NHTSA must balance the need for improvements in fuel economy against other factors, including the economic burden that more aggressive standards will place on automakers, related industries, and consumers.

97.     Maintaining consumer choice also plays an important role. Lawmakers emphasized that fuel-economy standards must "be carefully drafted" to improve fuel economy without "unduly limiting consumer choice." H.R. Rep. No. 94-340 at 87.

98.     Federal fuel-economy standards thus reflect the careful balance struck by NHTSA after considering the statutory factors. *See, e.g.*, 87 Fed. Reg. 25,710, 25,967–94 (May 2, 2022) (NHTSA weighing the statutory factors).

99.     Making clear its intent to establish a unified national framework for setting fuel-economy standards, Congress expressly provided that EPCA preempts any state and local "law[s] or regulation[s] *related to* fuel economy standards or average fuel economy standards." 49 U.S.C. § 32919(a) (emphasis added).

100.    The broad term "related to" reflects Congress's broad preemptive purpose. Indeed, Congress permitted only two narrow exceptions to this rule, neither of which applies here: a state may in specified circumstances adopt disclosure requirements that are

identical to federal requirements, *id.* § 32919(b), and a state may "prescribe requirements for fuel economy for automobiles obtained for its own use," *id.* § 32919(c).

101. Congress did not authorize NHTSA or EPA (or anyone else) to waive EPCA preemption. *See, e.g.*, 86 Fed. Reg. 74,236, 74,241 (Dec. 29, 2021) ("EPCA is totally silent as to any role for NHTSA in further defining EPCA preemption.").

102. Accordingly, unless one of the statute's two narrow exceptions applies, EPCA expressly preempts any and all state laws related to fuel-economy standards.

103. EPA regulates new motor-vehicle emissions under Section 202 of the CAA. *See* 42 U.S.C. § 7521(a)(1) (directing EPA to "prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [EPA's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare").

104. The Supreme Court held in *Massachusetts v. EPA*, 549 U.S. 497 (2007), that EPA has authority under CAA Section 202 to regulate greenhouse-gas emissions from new motor vehicles. Beginning in 2010, EPA has set national standards limiting greenhouse-gas emissions from new motor vehicles. *See* 75 Fed. Reg. 25,324 (May 7, 2010).

105. Like EPCA, the CAA envisions a nationally uniform regulatory approach to motor-vehicle emission standards: it expressly preempts states from "adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). The CAA, in other words,

expressly "prohibits states from adopting their own vehicle emissions standards." *California v. EPA*, 940 F.3d 1342, 1345 (D.C. Cir. 2019).

106.   Congress authorized departure from this uniform national framework only in limited circumstances. Under CAA Section 209(b), EPA may waive CAA preemption for California—and only California—if, among other things, California needs its own standards "to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(b).[4]

107.   If EPA has granted California a waiver of CAA preemption under Section 209(b), then Section 177, in turn, allows other states to "adopt and enforce" standards identical to California's under specified circumstances. *Id.* § 7507.

108.   In 2005, under Section 209(b)'s waiver provision granting California special sovereign authority denied to all other states, California became the first state to approve motor-vehicle greenhouse-gas emission standards.

109.   EPA initially denied California's request for a CAA waiver for its greenhouse-gas standards, concluding that Section 209(b) was designed to allow California to address its local pollution problems (*i.e.*, smog), not global problems like climate change. *See* 73 Fed. Reg. 12,156 (Mar. 6, 2008).

---

[4] Section 209(b) does not mention California by name, referring instead to "any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966." 42 U.S.C. § 7543(b). But, as Congress knew, California is the only state that meets this historical criterion and "is thus the only state eligible for a waiver." *Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1100 n.1 (D.C. Cir. 1979).

110.   After a change in presidential administration, however, EPA reversed course and granted California its first greenhouse-gas waiver in 2009. *See* 74 Fed. Reg. 32,744 (July 8, 2009). Then, in 2013, EPA granted California a waiver for the greenhouse-gas standards and ZEV mandate at issue here. *See* 78 Fed. Reg. 2,112 (Jan. 9, 2013).

111.   Since EPA first granted California a greenhouse-gas waiver, 17 states—now including Minnesota—and the District of Columbia have adopted California's carbon-dioxide emission standards and/or ZEV mandate via Section 177.

112.   Critically, in granting California a CAA waiver, EPA expressly declined to address EPCA preemption. *See* 74 Fed. Reg. at 32,783 ("EPA takes no position regarding whether … California's [greenhouse-gas] standards are preempted under EPCA.").

113.   Neither the CAA nor EPCA authorizes EPA or NHTSA (or any other agency) to waive EPCA preemption.

114.   These developments led NHTSA to examine whether these state regulations are related to fuel-economy standards and thus preempted under EPCA.

115.   In a 2006 rulemaking, NHTSA determined that state motor-vehicle greenhouse-gas regulations are "expressly preempted" by EPCA because they have "the direct effect of regulating fuel consumption." 71 Fed. Reg. 17,566, 17,654 (Apr. 6, 2006).

116.   California's attempts to become a climate regulator also prompted a response from automakers, who brought lawsuits alleging that EPCA preempts state regulations of vehicle greenhouse-gas emissions. Two federal district courts disagreed. *See Green*

*Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295 (D. Vt. 2007); *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151 (E.D. Cal. 2007).[5]

117.   But soon after, in a 2008 proposed rulemaking, NHTSA reaffirmed its position that state motor-vehicle greenhouse-gas regulations are both expressly and impliedly preempted by EPCA. *See* 73 Fed. Reg. 24,352, 24,478 (May 2, 2008) ("[N]HTSA has consistently taken the position that state regulations regulating $CO_2$ tailpipe emissions from automobiles are expressly and impliedly preempted."). In doing so, NHTSA expressly noted that it "respectfully disagree[d] with the two district court rulings." *Id.*

118.   While appeals from those decisions were pending, American automakers, EPA, NHTSA, and the California Air Resources Board (CARB) reached an agreement in which EPA and NHTSA committed to issuing joint regulations, while CARB agreed to deem automakers that complied with federal regulations to be in compliance with California' regulations. As part of this agreement, the automakers withdrew their appeals in the EPCA preemption cases, and they were never decided.

119.   EPA and NHTSA later reaffirmed their commitment to unified national standards through a series of actions, including a joint 2012 rulemaking that set greenhouse-gas emission standards for model years 2017–2025 and fuel-economy standards for model years 2017–2021. *See* 77 Fed. Reg. 62,624 (Oct. 15, 2012).

---

[5] One of them agreed before it disagreed. *See Cent. Valley Chrysler-Plymouth v. CARB*, No. CV-F-02-5017, 2002 WL 34499459 (E.D. Cal. June 11, 2002) (preliminarily enjoining earlier version of California's ZEV mandate based on EPCA preemption).

120.   In September 2019, as part of a joint rulemaking reevaluating federal greenhouse-gas and fuel-economy standards, EPA withdrew California's CAA waiver and NHTSA issued regulations codifying its longstanding view that EPCA preempts state greenhouse-gas and ZEV standards. *See* 84 Fed. Reg. 51,310 (Sept. 27, 2019).

121.   After a change in presidential administration, the agencies reversed course. NHTSA rescinded its preemption regulations and withdrew its prior statements that EPCA preempts state regulations of motor-vehicle greenhouse-gas emissions and ZEV mandates, instead expressing no view on the matter. *See* 86 Fed. Reg. 74,236.

122.   EPA similarly reversed its prior action, reinstating California's CAA preemption waiver. *See* 87 Fed. Reg. 14,332 (Mar. 14, 2022).

123.   Several of the Plaintiffs here, alongside a coalition of states, have challenged EPA's reinstatement of California's CAA waiver in a case currently pending before the D.C. Circuit. *See Ohio, et al. v. EPA*, No. 22-1081 (D.C. Cir.).

### *The Clean Cars Minnesota Rules*

124.   MPCA consists of a commissioner, a deputy commissioner, and three assistant commissioners, all appointed by the Governor.

125.   The Legislature directed MPCA to "adopt standards of air quality, including maximum allowable standards of emissions of air contaminants from motor vehicles." Minn. Stat. § 116.07, subd. 2(a). It also authorized MPCA to adopt rules and standards "for the prevention, abatement, or control of air pollution." *Id.* subd. 4(a).

126.   The statute further provides that the "rules or standards may relate to sources or emissions of air contamination or air pollution, to the quality of or composition of the

ambient air or outdoor atmosphere or to any other matter relevant to the prevention, abatement, or control of air pollution." *Id.*

127.   Pursuant to this authority, MPCA adopted the rules at issue.

128.   To bypass the CAA's preemption provision, MPCA invoked Section 177's exception allowing other states to "adopt and enforce" standards that are otherwise preempted under the CAA only if, *inter alia*, "such standards are identical to the California standards for which a waiver has been granted." 42. U.S.C. § 7507.

129.   Accordingly, MPCA adopted rules that "incorporate by reference" over 45 provisions of the California Code of Regulations concerning greenhouse-gas emissions, including California's LEV carbon-dioxide emission limits and ZEV mandate. Minn. R. 7023.0150 (incorporating by reference California regulations); *see* Minn. R. 7023.0200 (Definitions); 7023.0250 (LEV Standards); 7023.0300 (ZEV Standards).

130.   MPCA's rules became effective on December 31, 2021, and are "applicable to [model year] 2025, which begins January 1, 2024." SONAR at 70 n.111.

131.   The incorporated California regulations sweep broadly, imposing maximum exhaust emissions for certain vehicles that become increasingly burdensome each year, *see* Cal. Code Regs. tit. 13, § 1961.2, and average carbon-dioxide emission standards that also become more stringent each year, *id.* § 1961.3.

132.   Perhaps most striking of all is California's rule requiring the "total ZEV percent requirement" for large manufacturers in 2025 to be *22%. Id.* § 1962.2.

133.    Minnesota Rule 7023.0200 adopts definitions of terms. For example, it defines the "First effective model year" as the first model year for which the standards are effective according to a notice published by the Commissioner in the *State Register*.[6]

134.    Minnesota Rule 7023.0250 requires vehicles delivered for sale or lease in Minnesota to be certified to meet California's LEV standards. This rule applies to new motor vehicles that are passenger cars, light-duty trucks, medium-duty passenger vehicles, and medium-duty vehicles; new light- or medium-duty motor-vehicle engines; and motor vehicles with a new motor-vehicle engine. This rule further requires manufacturers to comply on a fleetwide basis, establishes record-retention and reporting obligations, and requires manufacturers to affix labels of LEV compliance consistent with California's standards.

135.    Minnesota Rule 7023.0300 requires manufacturers who make vehicles available in Minnesota for sale or lease to supply the percentage of ZEVs required under California's regulations. It also requires manufacturers to establish an account in the California ZEV credit system. In turn, it mandates that manufacturers must make up any deficits in the number of vehicles they supply by submitting ZEV credits to the credit bank.

---

[6] This provision was necessary because, at the time MPCA issued the rules, California did not have a waiver in place for its greenhouse-gas standards or its ZEV mandate, the waiver having been withdrawn by EPA in 2019. *See* SONAR at 36. As described above, EPA has since reinstated California's CAA preemption waiver, subject to pending judicial challenges. *See* 87 Fed. Reg. 14,332.

This rule allows manufacturers to earn credits for vehicles delivered to Minnesota in advance of the rule's compliance deadlines.

136.    Since MPCA's adoption of California's regulations, CARB has approved new regulations that would ultimately ban all sales of new gas-powered cars and light-duty trucks by 2035.[7] *See* Final Regulation Order, Cal. Code Regs. tit. 13 § 1962.4 (effective Nov. 30, 2022); CARB, *Public Hearing to Consider Advanced Clean Cars II Regulations: Final Statement of Reasons for Rulemaking, Including Summary of Comments and Agency Response*, (Aug. 25, 2022) ("CARB Final Statement of Reasons").[8]

137.    California's new regulations require that 35% of model year 2026 car and light-duty truck sales in California be ZEVs, and steadily increase that percentage until 2035, "reach[ing] 100% new vehicle ZEVs and clean plug-in hybrid-electric vehicles (PHEVs) in California by the 2035 model year." CARB Final Statement of Reasons at 1.

138.    The upshot is this: with the exception of a small subset of plug-in hybrid vehicles, California's new regulations prohibit the sale of all new gas- and diesel-powered cars and light-duty trucks in California by 2035. *See* Final Regulation Order, Cal. Code Regs. tit. 13, § 1962.4 (effective Nov. 30, 2022).

---

[7] These regulations were approved by the Office of Administrative Law and have an effective date of November 30, 2022. *See* CARB, *Advanced Clean Cars II* (last visited Mar. 2, 2023), http://bit.ly/3K0bGRd; *see also* CARB, *California moves to accelerate to 100% new zero-emission vehicles sales by 2035* (Aug. 25, 2022), https://bit.ly/3yncKHZ (announcing that CARB "approved the trailblazing Advanced Clean Cars II rule" that "establishes a year-by-year roadmap so that by 2035 100% of new cars and light trucks sold in California will be zero-emission vehicles").

[8] https://bit.ly/3wVOifB.

139.   Although EPA has not yet granted California a CAA waiver for this new program, if and when EPA does so, MPCA could seek to opt Minnesota into California's new standards under CAA Section 177, just as it did here.

### COUNT I
**Preemption under the Energy Policy and Conservation Act of 1975**
**(49 U.S.C. § 32901 *et seq.*; 42 U.S.C. § 1983)**

140.   The foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

141.   EPCA expressly preempts any state and local "law[s] or regulation[s] *related to* fuel economy standards or average fuel economy standards." 49 U.S.C. § 32919(a) (emphasis added).

142.   Rules limiting tailpipe carbon-dioxide emissions are inextricably connected to fuel-economy standards because they directly and substantially affect manufacturers' corporate average fuel economy.

143.   The greater a vehicle's fuel economy, the fewer grams of carbon dioxide it will emit per mile, and vice versa. *See, e.g.*, 71 Fed. Reg. at 17,659.

144.   Congress clearly understood this relationship, even specifying in EPCA that fuel economy be measured using testing procedures gauging carbon-dioxide emissions. *See* 49 U.S.C. § 32904(c); 38 Fed. Reg. 10,868 (May 2, 1973).

145.   Given the direct, scientific, and mathematical relationship between fuel economy and carbon-dioxide emissions, a vehicle fuel-economy standard can be stated as a carbon-dioxide emission standard, and vice versa.

146.    Tailpipe carbon-dioxide emissions and fuel economy are thus two sides of the same coin, and a rule regulating one is a *de facto* regulation of the other.

147.    The LEV and ZEV rules adopted by MPCA limit carbon-dioxide tailpipe emissions and thus are *de facto* regulations of fuel economy.

148.    MPCA itself recognized this, explaining that "[t]he primary way manufacturers reduce [greenhouse-gas] emissions to comply with these standards is to *improve the fuel economy of their vehicles*." SONAR at 72 (emphasis added); *see also id.* at 78 ("[greenhouse-gas] emissions standards generally result in improvements in fuel economy."); *id.* at 65 (projecting fuel savings from the rules).

149.    Accordingly, these rules are "related to fuel economy standards," and are therefore expressly preempted by EPCA. *See, e.g.*, *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 157 (2d Cir. 2010) (holding that EPCA preempted New York's hybrid taxi mandate and explaining that EPCA preempts state rules that "make fuel economy standards essential to the operation of those rules").

150.    MPCA's rules also are impliedly preempted because they stand as an obstacle to the accomplishment of Congress's full purposes and objectives in creating a uniform national framework for fuel-economy regulation.

151.    Congress charged NHTSA with setting nationally uniform fuel-economy standards at the "maximum feasible" level, after considering enumerated statutory factors.

152.    This scheme leaves no room for the state officials—whether in California or Minnesota—to reweigh those statutory factors, or to consider other factors of their own

choosing, and reach their own conclusions as to the level of fuel economy automakers' fleets must achieve.

153.   These conclusions apply with equal force to state ZEV mandates as they do to carbon-dioxide emission limits.

154.   Because ZEVs are included in calculating automakers' average fuel economy for purposes of compliance with federal fuel-economy standards, *see* 49 U.S.C. §§ 32904(a)(2), state ZEV mandates have a direct and substantial impact on corporate average fuel economy.

155.   State ZEV mandates also conflict with Congress's determination that the "maximum feasible" fuel-economy standard should be set without regard to ZEVs. *See id.* § 32902(h)(1).

156.   Congress expressly forbade NHTSA from imposing ZEV mandates by setting fuel-economy standards so stringent that manufacturers must dedicate a portion of their fleets to ZEVs in order to meet them.

157.   Allowing states to countermand that determination by mandating ZEVs—on top of the "maximum feasible" fuel-economy standards set by NHTSA—undoes Congress's careful approach to ZEVs and necessarily interferes with NHTSA's balancing of the statutory factors in establishing fuel-economy standards.

158.   The United States Constitution makes federal law and regulations "the supreme Law of the Land." U.S. Const., art. VI, cl. 2. Plaintiffs and their members have legally protected interests under the Constitution, EPCA, and other federal laws (including

42 U.S.C. § 1983) in the full enforcement of the federal fuel-economy laws against Defendants' enforcement of these rules.

159.     To redress these violations of federal law and the interference with rights of Plaintiffs and their members, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and other provisions of law, including the Supremacy Clause and 42 U.S.C. § 1983, Plaintiffs request a declaration that MPCA's rules are preempted and unenforceable.

160.     Unless Defendants are enjoined from enforcing the challenged rules, the rules will remain in effect in violation of federal law, will continue to harm Plaintiffs and their members, and will be enforced by Defendants.

161.     Plaintiffs are also entitled to an injunction barring Defendants from enforcing these rules and redressing these violations of federal law under 42 U.S.C. § 1983, *Ex Parte Young*, 209 U.S. 123 (1908), and the Supremacy Clause.

## COUNT II
### Equal Sovereignty Doctrine
### (U.S. Const.; 42 U.S.C. §§ 7543, 7507; 42 U.S.C. § 1983)

162.     The foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

163.     The U.S. Constitution requires that the federal government respect the equal sovereignty of all states, guaranteeing that all states have an equal capacity for self-government. Thus, Congress may not grant more regulatory authority or capacity for self-government to one state than to others. This fundamental principle of equality of the states undergirds our Republican form of government.

164.   Section 209(b) of the CAA permits EPA to "waive application of" CAA preemption for California—and *no other state*—if California "need[s]" its own separate motor-vehicle emission standards to "meet compelling and extraordinary conditions" in the state and other statutory requirements are met. 42 U.S.C. § 7543(b).

165.   Under Section 177 of the CAA, other states may "adopt and enforce" motor-vehicle emission standards only if they are "identical" to California standards for which a waiver has been granted. *Id.* § 7507.

166.   Thus, Congress has granted California—and California alone—the regulatory authority to adopt motor-vehicle emission standards needed to meet "compelling and extraordinary conditions" in California.

167.   Other states have no power to adopt their own motor-vehicle emissions standards based on their own assessment of what emission standards best address the conditions within their borders.

168.   These provisions thus selectively grant California (and only California) the authority to set emission standards different from those set by the federal government, thereby granting California more regulatory authority and capacity for self-government— a greater degree of sovereignty—than all the other states.

169.   Section 209(b) is therefore unconstitutional in all of its applications.

170.   At a minimum, Section 209(b) is unconstitutional as applied to state standards aimed at addressing the risks of global climate change.

171. There is no basis for granting California, and California alone, authority to regulate a fundamentally national (indeed, global) issue like how to address the risks of global climate change.

172. Because Section 209(b) violates the constitutional equal-sovereignty doctrine, both it and Section 177 are void and cannot authorize MPCA's rules.

173. Consequently, MCPA's rules—like California's and all other state motor-vehicle emission standards—are preempted by Section 209(a) of the CAA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that Minn. R. 7023.0150, 7023.0200, 7023.0250, 7023.0300 violate federal law in the manner alleged above;

2. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that 42 U.S.C. § 7543(b) and 42 U.S.C. § 7507 violate the Constitution in the manner alleged above;

3. A permanent injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from enforcing Minn. R. 7023.0150, 7023.0200, 7023.0250, 7023.0300; and

4. Such other relief available under federal, state, and local law as this Court may deem just and proper, including attorneys' fees and costs of this action to the extent allowed by federal, state, or local law.

Dated: March 13, 2023

/s/ *Thomas H. Boyd*
Thomas H. Boyd, #200517
Tammera R. Diehm, #327566
Kyle R. Kroll, #398433
**WINTHROP & WEINSTINE, P.A.**
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402
(612) 604-6400
tboyd@winthrop.com
tdiehm@winthrop.com
kkroll@winthrop.com

*Attorneys for Plaintiff Minnesota Service Station & Convenience Store Association*


Gordon D. Todd (D.C. Bar No. 475203)
  (*pro hac vice forthcoming*)
Eric D. McArthur (D.C. Bar No. 987560)
  (*pro hac vice forthcoming*)
Cody L. Reaves (D.C. Bar No. 1708117)
  (*pro hac vice forthcoming*)
**SIDLEY AUSTIN LLP**
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (facsimile)
gtodd@sidley.com
emcarthur@sidley.com
cody.reaves@sidley.com

*Attorneys for Plaintiff National Association of Convenience Stores*

C. Boyden Gray (D.C. Bar No. 122663)
  (*pro hac vice forthcoming*)
Jonathan Berry (D.C. Bar No. 1016352)
  (*pro hac vice forthcoming*)
Michael Buschbacher (D.C. Bar No. 1048432)
  (*pro hac vice forthcoming*)
**BOYDEN GRAY & ASSOCIATES PLLC**
801 17th Street, NW, #350
Washington, DC 20006
(202) 955-0620
(202) 955-0621 (facsimile)
cbg@boydengrayassociates.com
berry@boydengrayassociates.com
michael@boydengrayassociates.com

*Attorneys for Plaintiffs Clean Fuels Development Coalition, Minnesota Soybean Growers Association*, ICM, Inc., *and the Minnesota Service Station & Convenience Store Association*

25927135v1

33