UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CLEAN FUELS DEVELOPMENT COALITION, MINNESOTA SOYBEAN GROWERS ASSOCIATION, ICM, INC., MINNESOTA SERVICE STATION & CONVENIENCE STORE ASSOCIATION, and NATIONAL ASSOCIATION OF CONVENIENCE STORES, | Case No. 23-cv-00610-KMM-DTS |
| Plaintiffs, | |
| v. | |
| KATRINA KESSLER, in her official capacity as Commissioner of the MINNESOTA POLLUTION CONTROL AGENCY (MPCA); PETER TESTER, in his official capacity as Deputy Commissioner of MPCA; FRANK KOHLASCH, in his official capacity as Assistant Commissioner of MPCA; KIRK KOUDELKA, in his official capacity as Assistant Commissioner of MPCA; DANA VANDERBOSCH, in her official capacity as Assistant Commissioner of MPCA; and TIMOTHY J. WALZ, in his official capacity as Governor of the State of Minnesota, | **FIRST AMENDED COMPLAINT** |
| Defendants. | |

Plaintiffs Clean Fuels Development Coalition, Minnesota Soybean Growers Association, ICM, Inc., Minnesota Service Station & Convenience Store Association, and National Association of Convenience Stores bring this action for declaratory and injunctive relief against Defendants and state as follows:

## INTRODUCTION

1.     This action challenges rules issued by the Minnesota Pollution Control Agency ("MPCA") governing automobile carbon-dioxide emissions—rules that MPCA has admitted require automakers to increase the fuel economy of the automobile fleets they make.

2.     Specifically, this action challenges MPCA's rules (1) imposing Low Emission Vehicle ("LEV") carbon-dioxide emission limits; and (2) mandating a minimum market-share quota for "Zero Emission Vehicles" or ZEVs.[1]

3.     The LEV carbon-dioxide emission limits require automakers to produce and deliver for sale in Minnesota only passenger cars, light trucks, and medium-duty vehicles

---

[1] The term "zero emission vehicle" tracks the term used in the challenged regulations. But it is a misnomer: generating electricity to power an electric vehicle emits greenhouse gases, as does manufacturing a lithium-ion battery. Studies suggest that electric vehicles don't necessarily have lower greenhouse-gas emissions compared to a conventional strong hybrid and operation with renewable fuels. *See* Tristan Burton et al., *A Data-Driven Greenhouse Gas Emission Rate Analysis for Vehicle Comparisons*, SAE 12-12-01-0006 (2022) ("We find that currently there is no evidence to support the idea that [electric vehicles] lead to a uniform reduction in vehicle emission rates in comparison to [hybrids] and in many scenarios have higher [greenhouse-gas] emissions."); Steffen Mueller & Stefan Unnasch, *High Octane Low Carbon Fuels: The Bridge to Improve Both Gasoline and Electric Vehicles* 1 (Mar. 2021), https://perma.cc/WEA5-RJGN (when considering the regional, marginal electricity mix, "[h]igh octane fuel vehicles with ethanol provide very similar [greenhouse-gas] savings compared to EVs … for many states").

2

that are certified as meeting a fleetwide-average standard for carbon-dioxide emissions per mile. The ZEV mandate, meanwhile, requires that a certain percentage of the cars and light trucks that each automaker delivers for sale in Minnesota each year have zero tailpipe emissions—a *de facto* market-share quota for electric vehicles. *See Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2129 (2025).

4.     Although these rules apply in Minnesota, imposing considerable costs on much of the transportation sector, liquid-fuel interests (including Minnesota's biofuel industry), and citizens across the State, neither the Minnesota Legislature nor MPCA had any hand in drafting them. Instead, MPCA "incorporated by reference" over 45 provisions of the California Code of Regulations that regulate automobile emissions, simply noting that the term "Minnesota" should be "substitut[ed]" for "California." Minn. R. 7023.0150, subp. 2–3; *see* MPCA, *Statement of Need and Reasonableness; Proposed Revisions to Minnesota Rules, Chapter 7023, Adopting Vehicle Greenhouse Gas Emissions Standards (Clean Cars Minnesota)* 40 (Dec. 2020) ("SONAR"), https://perma.cc/QCL2-2L2D ("MPCA is proposing to use incorporation by reference to adopt California's LEV and ZEV standards.").

5.     The incorporated California regulations are sweeping. As relevant here, the LEV standard imposes fleetwide-average carbon-dioxide emission limits that increase in stringency each year until they plateau in model year 2025 and later years. Cal. Code Regs.

tit. 13, § 1961.3. The ZEV mandate imposes a minimum 22% ZEV credit-percentage re-
quirement for large manufacturers in model year 2025. *Id.* § 1962.2.[2]

6.     The express purpose and undeniable effect of these rules is to reduce the
consumption of liquid fuels and to force a transition to electric vehicles. MPCA itself pro-
jected that the rules will cause "a reduction of approximately 700 million gallons of gaso-
line purchased by Minnesotans" over the first 10 years alone. SONAR at 65.

7.     Federal law, specifically the Energy Policy and Conservation Act ("EPCA"),
forbids this scheme. *See* 49 U.S.C. § 32901 *et seq.*

8.     In EPCA, Congress created a single, uniform national program for regulating
the fuel economy of automobiles, authorizing the National Highway Traffic Safety Admin-
istration ("NHTSA") to set the "maximum feasible" fuel economy standards for the entire
country. *Id.* § 32902(a). Automobiles subject to national fuel economy standards include
passenger cars, light trucks, and some medium-duty vehicles subject to MPCA's rules. *See
id.* § 32901(a)(3) (defining automobile).

9.     To preserve this unified national framework, Congress included an express
preemption provision with the broadest possible language. It forbids any "State or a polit-
ical subdivision of a State" to "adopt or enforce a law or regulation *related to* fuel economy

---

[2] The corresponding electric-vehicle market-share requirement may be less than the
ZEV credit percentage requirement since each electric vehicle sold can generate up to four
credits, depending on the vehicle's all-electric range. *See* Cal. Code Regs. tit. 13,
§ 1962.2(d)(5)(A).

standards or average fuel economy standards." *Id.* § 32919(a) (emphasis added). The Supreme Court has described "related to" preemption provisions such as this one as "deliberately expansive," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987), and "conspicuous" in their breadth, *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990). A state regulation "relate[s] to" a federal law or regulation as long as it has a "connection with," or contains a "reference to," the regulated topic. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 367, 370 (2008) (emphasis omitted) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).

10.    MPCA's rules fall squarely within this preemption provision. The LEV rules, by limiting tailpipe carbon-dioxide emissions from fuel-powered automobiles, directly regulate fuel economy. Fuel economy and carbon dioxide emissions are two sides of the same coin. Because the natural byproduct of burning fuel (e.g., gasoline or diesel) is carbon dioxide, there is a direct, scientific, and inverse mathematical relationship between tailpipe carbon-dioxide emissions and fuel economy—the greater an automobile's fuel economy, the fewer grams of carbon dioxide the automobile will emit per mile, and vice versa. Thus, "any rule that limits tailpipe $CO_2$ emissions" from fuel-powered automobiles "is effectively identical to a rule that limits fuel consumption." *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) (per curiam) (alteration omitted) (quoting 76 Fed. Reg. 57,106, 57,124–25 (Sept. 15, 2011)); *see also* 49 U.S.C § 32901(a)(5), (10)–(11) (defining fuel as "gasoline" or "diesel," fuel economy, and average fuel economy). MPCA itself acknowledged this link, explaining that "[t]he primary way manufacturers reduce [greenhouse-gas] emissions to comply with these standards is to improve the fuel economy of their vehicles."

SONAR at 72; *see also id.* at 78 ("[Greenhouse-gas] emissions standards generally result in improvements in fuel economy."); *id.* at 65 (projecting fuel savings from the rules).

11.    Likewise, the ZEV mandate is "related to" fuel economy standards and average fuel economy standards. The regulations mandate sales of ZEVs, defined as "vehicles that produce zero exhaust emissions of any … greenhouse gas." Cal. Code Regs. tit. 13, § 1962.2(a); Minn. R. 7023.0200, subp. 15 ("'ZEV' has the meaning given under California Code of Regulations, title 13, section 1962.2(a)."). In other words, a ZEV is an automobile that consumes no fuel. And the ZEV mandate requires decreasing the market share of automobiles that do consume fuel. The ZEV mandate is therefore related to fuel economy and average fuel economy standards because the entire purpose is to reduce the fuel consumed by the state's automotive fleet per mile.

12.    That the regulations do not say the magic words "fuel economy" is irrelevant.[3] "States and localities can't skirt the text of broad preemption provisions by doing indirectly what Congress says they can't do directly." *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1056 (9th Cir. 2023) (emphases omitted). And although EPCA allows manufacturers to meet NHTSA's average fuel economy standards on a fleetwide basis by producing any combination of automobiles that the national market will bear, using whatever technological approaches to fuel economy they think best, the ZEV mandate requires a

---

[3] An earlier version of the California's regulations expressly referenced fuel economy, but California amended the regulations to remove "all references to fuel economy or efficiency" in response to litigation. 83 Fed. Reg. 42,986, 43,238 n.539 (Aug. 24, 2018) (citation omitted).

specific pathway. Manufacturers must either sell a certain percentage of ZEVs or purchase credits from competitors. The ZEV mandate thus relates to federal average fuel economy standards because it "force[s] [a manufacturer] to adopt a certain scheme" and "restrict[s] its choice" of how to comply. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995).

13.    Indeed, the ZEV mandate presents a particularly strong conflict with the statutory scheme Congress established in EPCA because Congress expressly forbade NHTSA from even considering the fuel economy of automobiles that run on "alternative fuel[s]" (such as electricity) when setting fuel economy standards. 49 U.S.C. §§ 32901(a)(1)(J), (a)(8), 32902(h)(1). Congress therefore decided that electric vehicles should be an optional compliance flexibility, not a mandate. MPCA's ZEV mandate conflicts with that deliberate congressional choice by mandating electric vehicles anyway.

14.    MPCA's rules are thus preempted by EPCA and must be enjoined.

## **PARTIES**

15.    Plaintiff Clean Fuels Development Coalition ("CFDC") is a business league organization established in 1988. CFDC works with auto, agriculture, and biofuel interests in support of a broad range of energy and environmental programs to advance human health and well-being, environmental quality, and American agriculture.

16.    Plaintiff Minnesota Soybean Growers Association ("MSGA") is a non-profit, farmer-controlled advocacy organization that works on behalf of Minnesota's soybean farmers to promote farm-friendly policies.

17.    Plaintiff ICM, Inc. ("ICM") is a Kansas corporation and a global leader in developing biorefining capabilities, especially for the production of ethanol. ICM has designed over 100 ethanol plants currently in service, and plants using ICM technology collectively produce some 8.8 billion gallons of ethanol annually—approximately one-third of the world's ethanol production.

18.    Plaintiff Minnesota Service Station & Convenience Store Association ("MSSA") is a trade organization founded in 1966 that advocates for the interests of Minnesota's independent service station owners and automotive repair facilities.

19.    Plaintiff National Association of Convenience Stores ("NACS") is a global trade association headquartered in Alexandria, Virginia, that represents more than 1,300 retail and 1,600 supplier members, providing industry-leading research and analysis, networking and education opportunities, and advocacy to ensure the competitive viability of its member businesses.

20.    Defendant Katrina Kessler is a citizen of Minnesota. Kessler serves as Commissioner of MPCA and is sued in her official capacity.

21.    Defendant Peter Tester is a citizen of Minnesota. Tester serves as Deputy Commissioner of MPCA and is sued in his official capacity.

22.    Defendant Frank Kohlasch is a citizen of Minnesota. Kohlasch serves as Assistant Commissioner of MPCA and is sued in his official capacity.

23.    Defendant Kirk Koudelka is a citizen of Minnesota. Koudelka serves as Assistant Commissioner of MPCA and is sued in his official capacity.

24.    Defendant Dana Vanderbosch is a citizen of Minnesota. Vanderbosch serves as Assistant Commissioner of MPCA and is sued in her official capacity.

25.    Defendant Timothy J. Walz is a citizen of Minnesota. Walz serves as Governor of the State of Minnesota and is sued in his official capacity.

## JURISDICTION AND VENUE

26.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this case arises under the Constitution and laws of the United States.

27.    This Court has authority under 42 U.S.C. § 1983 and the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), to enjoin enforcement of MPCA's rules, and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

28.    Venue is proper in this district under 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and all Defendants are residents of Minnesota, and because the challenged rules were adopted in this district and will be enforced by each Defendant in the course of the performance of his or her official duties in this district.

## STANDING

29.    Plaintiffs have standing to challenge MPCA's rules because they and their members face concrete, particularized, and imminent injuries that are caused by the adoption and enforcement of MPCA's rules and that are redressable by a court order declaring those rules unlawful and enjoining their enforcement.

30.    Plaintiffs and their members will suffer a direct and imminent financial injury from MPCA's rules. The rules are expressly designed to reduce consumption of liquid fuel in Minnesota by forcing automakers to produce and sell automobiles that use less (or no)

liquid fuel. MPCA itself projects the rules will cause "a reduction of approximately 700 million gallons of gasoline purchased by Minnesotans" over the first 10 years. SONAR at 65.

31.    A decrease in fuel purchases resulting from government regulation constitutes a classic monetary injury. As the Supreme Court recently affirmed in *Diamond Alternative Energy*, "the decrease in purchases of gasoline and other liquid fuels resulting from the [LEV and ZEV] regulations hurts [Plaintiffs'] bottom line. Those monetary costs 'are of course an injury.'" 145 S. Ct. at 2135 (citation omitted).

32.    The financial injuries are concrete and widespread. Plaintiff MSGA's members, which include thousands of Minnesota soybean farmers, face lost sales of soybeans used as a feedstock for the 85 million gallons of biodiesel produced annually. Under Minnesota law, diesel fuel must be blended with at least 5% to 20% biodiesel, depending on time of year. Minn. Stat. § 239.77, subd. 2(a). MSGA's members therefore face imminent injury in the form of lost sales of soybeans that would otherwise be used to make diesel fuel for use in Minnesota vehicles.

33.    Plaintiff ICM, a global leader in ethanol production technology, will be injured by the reduced demand for ethanol, which makes up an average of 12% of each gallon of gasoline sold in Minnesota. A significant percentage of the ethanol currently sold in Minnesota is manufactured in plants designed, built, maintained, or retrofitted by ICM.

34.    MPCA's rules will thus decrease the demand for all aspects of ICM's products and services, including new ethanol plant design, construction, maintenance, service, and retrofitting.

35. The members of Plaintiffs MSSA and NACS—which include hundreds of service stations and convenience stores across Minnesota, such as MSSA members Bona Companies Inc., and Ralphie's Minnoco; and NACS members Bobby's & Steve's Auto World and 36 Lyn Refuel Station, as well as hundreds of Kwik Trip outlets throughout the State—will be injured by the rule.

36. One injury will be lost fuel sales: these stations sell large volumes of gasoline (that include ethanol) and diesel fuels (including biodiesel), the demand for which will be reduced by MPCA's rules. For example, in 2022 MSSA member Bona Companies Inc. sold approximately 1 million gallons of liquid fuel; MSSA member Ralphie's Minnoco sold approximately 1.8 million gallons; MSSA member Rod's Country Corner Inc. sold approximately 800,000 gallons; and MSSA member Youngstedt Inc. sold approximately 950,000 gallons. Of these sales, approximately 56 percent, 40 percent, 31 percent, and 38 percent, respectively, were sales of higher-ethanol blends.

37. Additionally, many members have made significant investments in liquid-fuel infrastructure. For example, MSSA member Bona Companies Inc. recently invested more than $200,000 to install new blender pumps capable of providing low-carbon, higher-ethanol blends. The value of these investments will be diminished by MPCA's actions.

38. MSSA's and NACS's service station members will also be financially injured because drivers who refuel less often (or not at all) will less frequently patronize their convenience stores, which in turn will cause decreased sales of food, beverages, medications, automotive products, lottery tickets, and other convenience-store staples.

39.     These service stations will also face injury due to the costs associated with adapting to new consumer needs based on these rules in order to remain competitive, including the costs of training staff and the costs of establishing plug-in chargers to meet the artificial consumer demand created by these rules.

40.     Some service stations have installed or are currently installing electric-vehicle chargers and thus are, or will soon be, selling electricity to drivers. But these sales do not, and will not, make up for lost sales of gasoline and diesel fuels because "[m]any EV owners are able to meet their daily driving range requirements by charging overnight with Level 1 equipment [a standard 120-volt outlet], requiring no additional cost or installation." *Charging Electric Vehicles at Home*, Alt. Fuels Data Ctr., U.S. Dep't of Energy, https://perma.cc/EZ79-9LAM (visited Sept. 29, 2025).

41.     MPCA, too, has recognized that "most EV owners will recharge their vehicles overnight at their home." MPCA, *Charging While You Work* 1 (Dec. 2012), https://perma.cc/54LX-4GWG. MPCA has noted that research shows "about 80 percent of charging by EV owners is taking place at home." *Id.* "Unlike the 115,000 or so gas stations in the U.S. that are fueling most of our vehicles today," MPCA has explained, "there are tens of millions of households across the country that are suitable today to charge and provide 'fuel' for electric vehicles." *Id.*

42.     Thus, even with increasing sales of electricity, MSSA's and NACS's members will suffer financial loss because of MPCA's rules. Indeed, many of MSSA's and NACS's members have not installed, and have no plans to install charging stations—for these members, there is no good business case justifying such investments.

43.     Finally, MSSA's membership includes many independent automobile repair and maintenance shops in the State. These shops service cars and trucks powered by internal-combustion engines, including through routine work such as oil changes; most do not perform any work on electric vehicles, which generally require less frequent (and less labor-intensive) service and maintenance than conventional vehicles, and are often much more difficult to supply with replacement parts. Indeed, in some cases, electric-vehicle manufacturers *prohibit* third-party shops from servicing their electric vehicles.

44.     For example, MSSA member Youngstedt, Inc. provides full-service auto-repair at 10 locations with 80 service bays and just under 200 employees, and MSSA member Bona Companies Inc. provides similar services at 2 locations with 39 employees. Both companies report performing far fewer repairs on electric vehicles than on conventional vehicles, except for tires and wipers.

45.     Consequently, the demand for these members' repair services will decrease with MPCA's quota for increasing the market share of electric vehicles.

46.     MSSA's and NACS's members therefore face imminent financial harm from MPCA's rules, which decrease sales and increase costs for many of the products and services these members offer.

47.     Plaintiffs' injuries are directly caused by MPCA's rules. The Supreme Court has confirmed that causation is "straightforward" in such cases because "reducing purchases of liquid fuels such as gasoline … is the whole point of the regulations." *Diamond Alt. Energy*, 145 S. Ct. at 2135. "This court can make the 'commonsense economic inferences' that incentivizing the production of electric vehicles will result in manufacture[r]s

making more electric vehicles, and more electric vehicles being produced will result in more electric vehicles being used, harming" plaintiffs. *Iowa v. Wright*, No. 24-1721, 2025 WL 2554549, at *8 (8th Cir. Sept. 5, 2025).

48.    Finally, a favorable court order is likely to redress Plaintiffs' injuries. Invalidating MPCA's rules would redress Plaintiffs' injuries by removing a "regulatory impediment to the sale and use of their products" and allowing them to "compete more fully in the marketplace." *Diamond Alt. Energy*, 145 S. Ct. at 2134, 2136. Based on "commonsense economic principles," it is predictable that, without the rules, automakers would produce and sell more gasoline-powered automobiles, leading to increased fuel sales. *Id.* at 2136. Even "one dollar" of additional revenue would satisfy the redressability requirement. *Id.* at 2135.

49.    The very existence of the rules demonstrates that their removal would affect the market. As the Supreme Court explained discussing the California regulations MPCA has adopted here, the "whole point of the regulations is to increase the number of electric vehicles in the new automobile market beyond what consumers would otherwise demand and what automakers would otherwise manufacture and sell." *Id.* at 2137. And the Court noted that "EPA credited California's estimates that the regulations would continue reducing greenhouse-gas emissions in California *through at least 2037*." *Id.* at 2138 (citation omitted).

50.    Consistent with this, Minnesota has an "[o]ngoing priorit[y]" of "implement[ing] … the Clean Cars Minnesota rule" as part of its plan for "reduc[ing] [green-

house-gas] emissions from the transportation sector by 80% by 2040," "[d]ecreas[ing] ve-
hicle miles traveled [by] 20% per capita by 2050," and "[r]each[ing] 20% EVs on Minne-
sota roads by 2030." Minn. Climate Change Subcabinet, *Minnesota's Climate Action
Framework* 20, 26, https://perma.cc/Z3DE-MXZC (visited Oct. 14, 2025); *see also Reduc-
ing Transportation Emissions*, MPCA, https://perma.cc/RZE3-KBE9 (visited Sept. 29,
2025) ("The low-emission vehicle (LEV) standard sets limits for tailpipe pollution for auto
manufacturers, meaning it requires manufacturers to deliver new light- and medium-duty
vehicles to the Minnesota market that produce lower emissions of greenhouse gases and
other air pollutants…. The LEV standard preserves consumer access to the cleaner, more
efficient vehicles that Minnesotans enjoy today."). A court order enjoining the rules would
eliminate these market-distorting effects and redress Plaintiffs' ongoing financial harms.

51.     There is therefore "little question" that Plaintiffs have standing. *Diamond Alt.
Energy*, 145 S. Ct. at 2135 (citation omitted). Like the members of the fuel supply chain in
*Diamond Alternative*, Plaintiffs "might be considered an object of the [LEV and ZEV]
regulations because the regulations explicitly seek to restrict the use of gasoline and other
liquid fuels in automobiles." *Id.* When a government regulation "prohibits or impedes
Company A from using Company B's product, then both Company A and Company B
might be deemed objects of the" regulation and have standing to challenge it. *Id.*

52.     MSGA, MSSA, and NACS each have associational standing to bring this suit
on behalf of their respective members because (1) their members, as described above, have
standing to sue in their own right; (2) the interests they seek to protect are germane to their

15

organizational purposes, which include advocating for the economic viability of their members; and (3) neither the claims asserted nor the relief requested requires the participation of any individual members in this lawsuit.

## STATEMENT OF FACTS

### I.  Federal Law Background

53.    Two federal statutes—EPCA and the Clean Air Act ("CAA")—work together to establish a unified national regulatory program for automobile fuel economy and motor-vehicle emissions, respectively.

### A.  EPCA Establishes a Uniform National Fuel Economy Program.

54.    Congress passed EPCA in 1975 to establish a "single standard" for automobile fuel economy. S. Rep. No. 93-526, at 59 (1973); 42 U.S.C. § 6201(5). Under EPCA, NHTSA, exercising authority delegated from the Secretary of Transportation, must set national fuel economy standards through the Corporate Average Fuel Economy ("CAFE") program. *See* 49 U.S.C. §§ 322(a), (b), 32902(a), (b); 49 C.F.R. § 1.95(a) (delegation to NHTSA). As used in the Act, "fuel economy" means "the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used." 49 U.S.C. § 32901(a)(11).

55.    The federal fuel economy standards do not apply to individual automobiles or models. Rather, they regulate the fuel economy of each manufacturer's entire fleet of cars and light trucks, on a fleetwide-average basis. As a result, a manufacturer can produce and sell any combination of automobiles, so long as the fuel economy of its passenger car fleet and light truck fleet as a whole meet or exceed the standards set by NHTSA.

56.     Congress instructed NHTSA to establish these uniform national fuel economy standards at the "maximum feasible" level, *id.* § 32902(a), after considering four enumerated statutory factors: "technological feasibility," "economic practicability," "the effect of other motor vehicle standards of the Government," and "the need of the United States to conserve energy," *id.* § 32902(f). In considering these factors, NHTSA must balance the need for improvements in fuel economy against the economic burden that more aggressive standards will place on automakers, while also taking care not to "unduly limit[] consumer choice." H.R. Rep. No. 94-340, at 87; *see, e.g.*, 87 Fed. Reg. 25,710, 25,967–94 (May 2, 2022) (NHTSA weighing the statutory factors).

**B.     EPCA Expressly Preempts State Laws "Related To" Fuel Economy.**

57.     Leaving no doubt about its intent to establish a "single standard" nationwide for regulating fuel economy, Congress included an express preemption provision with the broadest possible language. It provides that EPCA preempts any state and local "law[s] or regulation[s] *related to* fuel economy standards or average fuel economy standards for automobiles." 49 U.S.C. § 32919(a) (emphasis added).

58.     Courts have affirmed the expansive scope of such language. The Supreme Court has interpreted the term "relate[d] to" in preemption statutes on many occasions. *Morales*, 504 U.S. at 383–84 (citing cases). The "ordinary meaning" of "relate[d] to" "is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,' —and the words thus express a broad pre-emptive purpose." *Id.* at 383 (quoting Black's Law Dictionary 1158 (5th ed. 1979)).

59.     Therefore, the Court of Appeals for the Second Circuit, for example, has held that "related to fuel economy standards or average fuel economy standards" must be construed broadly, applying the statute to prohibit local taxi-fleet rules encouraging the adoption of hybrid taxis. *See Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156–58 (2nd Cir. 2010); *see also Ophir v. City of Boston*, 647 F. Supp. 2d 86, 94 (D. Mass. 2009) (same).

60.     The Ninth Circuit, interpreting a similar preemption provision in a different part of EPCA, has also explained that words like "concerning" or "relating to" have a "'broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject'" *Cal. Rest. Ass'n*, 89 F.4th at 1103 (quoting *Lamar, Archer, & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). Accordingly, courts must read the term "expansively," recognizing that a regulation may "concern" a federally related subject "without directly regulating that thing." *Id.* (cleaned up).

61.     Congress permitted only two narrow exceptions to this broad preemption, neither of which applies here: a state may in specified circumstances adopt disclosure requirements that are identical to federal requirements, 49 U.S.C. § 32919(b), and a state may "prescribe requirements for fuel economy for automobiles obtained for its own use," *id.* § 32919(c).

## C.     The Clean Air Act Establishes a Parallel Program for Motor Vehicle Emissions.

62.     EPA regulates new motor-vehicle emissions under Section 202 of the CAA. *See* 42 U.S.C. § 7521(a)(1) (directing EPA to "prescribe (and from time to time revise) in

accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [EPA's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare").

63.    The Supreme Court held in *Massachusetts v. EPA*, 549 U.S. 497 (2007), that EPA has authority under CAA Section 202(a) to regulate greenhouse-gas emissions from new motor vehicles. Since 2010, EPA has set national standards limiting greenhouse-gas emissions from new motor vehicles. *See* 75 Fed. Reg. 25,324 (May 7, 2010). Because "any rule that limits tailpipe $CO_2$ emissions is effectively identical to a rule that limits fuel consumption," *Delta Constr. Co.*, 783 F.3d at 1294 (alteration omitted) (quoting 76 Fed. Reg. at 57,124–25), until recently these tailpipe greenhouse-gas standards have largely been harmonized with NHTSA's CAFE standards, primarily being published as joint rules, *see, e.g.*, 75 Fed. Reg. 25,324; 77 Fed. Reg. 62,624 (Oct. 15, 2012); 85 Fed. Reg. 24,174 (Apr. 30, 2020). EPA, however, has recently proposed to repeal all greenhouse-gas standards for motor vehicles. *See Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 Fed. Reg. 36,288 (Aug. 1, 2025).

64.    Like EPCA, the CAA envisions a nationally uniform regulatory approach: it expressly preempts states from "adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). The CAA, in other words, expressly "prohibits states from adopting their own vehicle emissions standards." *California by and through Brown v. EPA*, 940 F.3d 1342, 1345 (D.C. Cir. 2019).

65.    Unlike EPCA, however, the CAA authorizes EPA to waive CAA preemption for California—and only California—on certain conditions. 42 U.S.C. § 7543(b).[4] Section 177 of the CAA, in turn, authorizes other states to "adopt and enforce" motor-vehicle emissions standards identical to the California standards for which EPA has granted a waiver from CAA preemption without obtaining any further permission from EPA if all statutory conditions are met. *Id.* § 7507.

## II.    The Clean Cars Minnesota Rules

### A.    California Adopts LEV and ZEV Rules.

66.    In 2005, California became the first state to enact carbon-dioxide emission standards for new automobiles.

67.    The legal status of such standards has been in flux for well over a decade. In a 2006 rulemaking, NHTSA determined that state carbon-dioxide regulations applicable to automobiles are "expressly preempted" by EPCA because they have "the direct effect of regulating fuel consumption." 71 Fed. Reg. 17,566, 17,654 (Apr. 6, 2006).

68.    California's regulations also prompted a response from automakers and automobile dealers, who brought lawsuits alleging that EPCA preempts California's regulations of automobile greenhouse-gas emissions. Two federal district courts disagreed. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295 (D. Vt.

---

[4] Section 209(b) of the CAA does not mention California by name, referring instead to "any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966." 42 U.S.C. § 7543(b). But, as Congress knew, only California meets this historical criterion and "is thus the only state eligible for a waiver." *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1100 n.1 (D.C. Cir. 1979).

2007); *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151 (E.D. Cal. 2007).[5]

69.     But soon after, in a 2008 proposed rulemaking, NHTSA reaffirmed its position that state motor-vehicle greenhouse-gas regulations are both expressly and impliedly preempted by EPCA. *See* 73 Fed. Reg. 24,352, 24,478 (May 2, 2008) ("NHTSA has consistently taken the position that state regulations regulating $CO_2$ tailpipe emissions from automobiles are expressly and impliedly preempted."). In doing so, NHTSA expressly noted that it "respectfully disagree[d] with the two district court rulings." *Id.*

70.     While appeals from those decisions were pending, American automakers, EPA, NHTSA, and the California Air Resources Board ("CARB") reached an agreement in which EPA and NHTSA committed to issuing joint regulations, while CARB agreed to deem automakers that complied with federal regulations to be in compliance with California's regulations. As part of this agreement, the automakers withdrew their appeals in the EPCA preemption cases, and they were never decided.

71.     EPA initially denied California's request for a CAA waiver for its greenhouse-gas standards in 2008, concluding that Section 209(b) was designed to allow California to address its "local air pollution problems" (*i.e.*, smog), not "global climate change problems." *See* 73 Fed. Reg. 12,156, 12,157, 12,160 (Mar. 6, 2008).

72.     After a change in presidential administration, however, EPA reversed course

---

[5] Earlier, however, a district court preliminary enjoined California's first ZEV mandate based on EPCA preemption. *See Cent. Valley Chrysler-Plymouth v. Cal. Air Res. Bd.*, No. CV-F-02-5017, 2002 WL 34499459 (E.D. Cal. June 11, 2002).

21

and granted California its first greenhouse-gas waiver in 2009. *See* 74 Fed. Reg. 32,744 (July 8, 2009). Then, in 2013, EPA granted California a waiver for the greenhouse-gas standards and ZEV mandate at issue here. *See* 78 Fed. Reg. 2,112 (Jan. 9, 2013).

73.     In September 2019, as part of a joint rulemaking reevaluating federal greenhouse-gas and fuel economy standards, EPA withdrew California's CAA waiver and NHTSA issued regulations codifying its longstanding view that EPCA preempts state greenhouse-gas and ZEV standards. *See* 84 Fed. Reg. 51,310 (Sept. 27, 2019).

74.     After a change in presidential administration, the agencies reversed course. NHTSA rescinded its preemption regulations and withdrew its prior statements that EPCA preempts state regulations of motor-vehicle greenhouse-gas emissions and ZEV mandates, instead expressing no view on the matter. *See* 86 Fed. Reg. 74,236 (Dec. 29, 2021).

75.     EPA similarly reversed its prior action, reinstating California's CAA preemption waiver. *See* 87 Fed. Reg. 14,332 (Mar. 14, 2022).

76.     Several of the Plaintiffs here, alongside a coalition of states, have challenged EPA's reinstatement of California's CAA waiver in the D.C. Circuit. *See Ohio v. EPA*, No. 22-1081 (D.C. Cir.), and consolidated cases. The D.C. Circuit issued an opinion in that case on April 9, 2024, 98 F.4th 288, after which the Supreme Court granted certiorari on the limited question of standing. The Court denied certiorari on the other questions presented by the petitions for certiorari, including a claim that the CAA's waiver provision facially violates the constitutional equal-sovereignty doctrine.

77.     In the resulting case, *Diamond Alternative Energy, LLC v. EPA*, the Supreme

Court resolved the threshold question of standing, holding that fuel producers have standing to challenge regulations that reduce demand for their products. 145 S. Ct. at 2130.

78.    The case has since been remanded to the D.C. Circuit, where the question of whether EPCA preempts California's standards is one of several live issues. However, the timeline for a decision from the D.C. Circuit is indefinite, and the ultimate outcome is speculative.

79.    Although several other later preemption waivers granted by EPA under Section 209 were rescinded by legislation, *see* Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025), the CAA waiver authorizing the California regulations adopted by MPCA is still in effect. Nor has EPA proposed rescinding the waiver.

80.    Currently, more than a dozen states—including Minnesota—and the District of Columbia have adopted California's carbon-dioxide emission standards and/or ZEV mandate via Section 177.

### B.    Minnesota Adopts California's Standards.

81.    MPCA consists of a commissioner, a deputy commissioner, and three assistant commissioners, all appointed by the Governor. The Minnesota Legislature directed MPCA to "adopt standards of air quality, including maximum allowable standards of emission of air contaminants from motor vehicles." Minn. Stat. § 116.07, subd. 2(a). It also authorized MPCA to adopt rules and standards "for the prevention, abatement, or control of air pollution." *Id.* § 116.07, subd. 4(a).

82.    The statute further provides that the "rules or standards may relate to sources

or emissions of air contamination or air pollution, to the quality or composition of such emissions, or to the quality of or composition of the ambient air or outdoor atmosphere or to any other matter relevant to the prevention, abatement, or control of air pollution." *Id.*

83.    Pursuant to this authority, MPCA adopted the rules at issue.

84.    To bypass the CAA's preemption provision, MPCA invoked Section 177's exception allowing other states to "adopt and enforce" standards that are otherwise preempted under the CAA only if, *inter alia*, "such standards are identical to the California standards for which a waiver has been granted." 42 U.S.C. § 7507.

85.    Accordingly, MPCA adopted rules that "incorporat[e] by reference" over 45 provisions of the California Code of Regulations, including California's LEV carbon-dioxide emission limits and ZEV mandate. Minn. R. 7023.0150 (incorporating by reference California regulations); *see* Minn. R. 7023.0200 (Definitions); 7023.0250 (LEV Standards); 7023.0300 (ZEV Standards).

86.    Minnesota Rule 7023.0200 adopts definitions of terms. For example, it defines the "First effective model year" as the first model year for which the standards are effective according to a notice published by the Commissioner in the *State Register*.[6]

87.    Minnesota Rule 7023.0250 requires that some motor vehicles delivered for sale or lease in Minnesota be certified to meet California's LEV standards. This rule applies

---

[6] This provision was necessary because, at the time MPCA issued the rules, California did not have a waiver in place for its greenhouse-gas standards or its ZEV mandate, the waiver having been withdrawn by EPA in 2019. *See* SONAR at 36. As already noted, EPA has since reinstated California's CAA preemption waiver. *See* 87 Fed. Reg. 14,332.

to new motor vehicles that are passenger cars, light trucks, medium-duty passenger vehicles, and medium-duty vehicles; new light- or medium-duty motor-vehicle engines; and motor vehicles with a new motor-vehicle engine. This rule further requires manufacturers to comply on a fleetwide basis, establishes record-retention and reporting obligations, and requires manufacturers to affix labels of LEV compliance consistent with California's standards.

88.    Minnesota Rule 7023.0300 requires manufacturers that make motor vehicles available in Minnesota for sale or lease to supply the percentage of ZEVs required under California's regulations. It also requires manufacturers to establish an account in the California ZEV credit system. In turn, it mandates that manufacturers must make up any deficits in the number of motor vehicles they supply by submitting ZEV credits to the credit bank. This rule allows manufacturers to earn credits for motor vehicles delivered to Minnesota in advance of the rule's compliance deadlines.

89.    MPCA's rules were adopted following a hearing, became effective on December 31, 2021, and are "applicable to [model year] 2025, which beg[an] January 1, 2024," SONAR at 70 n.111.

90.    The incorporated regulations sweep broadly, imposing maximum non-methane organic gases, nitrogen oxides, carbon monoxide, formaldehyde, and particulate emissions for certain motor vehicles that become increasingly burdensome each year, *see* Cal. Code Regs. tit. 13, § 1961.2, and fleet-average carbon-dioxide emission standards that also become more stringent each year before plateauing after model year 2025, *id.* § 1961.3.

91.   With respect to the carbon-dioxide emission standards, for model year 2025 and later, the standards require manufacturers to meet a footprint-based fleetwide average carbon-dioxide limit, varying between 131 and 179 grams of carbon dioxide per mile for passenger cars and between 159 and 277 grams of carbon dioxide per mile for light trucks and medium-duty passenger vehicles, depending on the motor vehicle's size. *Id.*

92.   The standards also set a "minimum ZEV credit percentage requirement" for large manufacturers. In model year 2025, the percentage requirement is 22%. *Id.* § 1962.2.

93.   These standards thus set a floor for motor-vehicle emissions and a market-share quota for electric vehicles.

<u>**COUNT I**</u>
**Preemption under the Energy Policy and Conservation Act of 1975**
**(49 U.S.C. § 32901 *et seq.*; 42 U.S.C. § 1983)**

94.   The foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

95.   EPCA expressly preempts any state and local "law[s] or regulation[s] *related to* fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard." 49 U.S.C. § 32919(a) (emphasis added); *see also id.* § 32901(a)(3), (6), (11) (defining fuel economy, average fuel economy standard, and automobile).

96.   The Second Circuit has held that "related to fuel economy standards or average fuel economy standards" must be construed broadly, applying the statute to prohibit local taxi-fleet rules encouraging the adoption of hybrid taxis. *See Metro. Taxicab Bd. of Trade*, 615 F.3d at 156–58.

97.    The Ninth Circuit, interpreting a similar provision in EPCA, affirmed the expansive scope of such preemptive language. The court explained that words like "concerning"—which the Supreme Court treats as equivalent to "relating to"—have a "broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Cal. Rest. Ass'n*, 89 F.4th at 1103 (citation omitted). Accordingly, courts must read the term "expansively," recognizing that a regulation may concern a federally regulated subject "without directly regulating that thing." *Id.* (internal quotation marks omitted).

98.    MPCA's rules, which regulate tailpipe carbon-dioxide emissions and mandate the sale of zero-emission automobiles, fall squarely within this broad preemption provision.

99.    Passenger cars, light trucks, and some medium-duty vehicles regulated by MPCA are "automobiles" as defined in EPCA. 49 U.S.C. § 32901(a)(3).

100.    Passenger cars, light trucks, and some medium-duty vehicles regulated by MPCA are covered by an average fuel economy standard at least through model year 2031. 49 C.F.R. §§ 531.5(c), 533.5(a), (j).

101.    Carbon dioxide is the natural byproduct of burning a fuel such as gasoline or diesel to propel an automobile. 71 Fed. Reg. at 17,654, 17,659.

102.    EPA, for example, estimates a typical gallon of gasoline contains 2,421 grams of carbon, which would equal 8,887 grams of carbon dioxide when burned to power an automobile. *See* EPA, EPA420-F-05-001, *Average Carbon Dioxide Emissions Resulting from Gasoline and Diesel Fuel* 2–3 (Feb. 2005), https://perma.cc/SJL8-2WAP.

103.    Plugging this value into a simple equation: a gasoline-powered automobile that emits 404 grams of carbon dioxide per mile has a fuel economy of 22 miles per gallon, and vice versa. EPA, EPA-420-F-23-014, *Tailpipe Greenhouse Gas Emissions from a Typical Passenger Vehicle* 2 (June 2023), https://perma.cc/Y55K-SRY3 (8,887 / 404 = 22).

104.    Rules limiting tailpipe carbon-dioxide emissions are therefore scientifically connected to fuel economy standards because they directly and substantially affect automobile fuel economy and an automobile manufacturers' average fuel economy. The greater an automobile's fuel economy, the fewer grams of carbon dioxide it will emit per mile, and vice versa. *See, e.g.*, 71 Fed. Reg. at 17,659.

105.    Given this relationship, for the overwhelming majority of automobiles that have tailpipes and consume fuel, tailpipe carbon-dioxide emissions and fuel economy are two sides of the same coin, and a rule regulating one is a *de facto* regulation of the other. As the D.C. Circuit has recognized, "any rule that limits tailpipe $CO_2$ emissions is effectively identical to a rule that limits fuel consumption." *Delta Constr. Co.*, 783 F.3d at 1294 (alteration omitted) (quoting 76 Fed. Reg. at 57,124–25).

106.    Congress understood this relationship, even specifying in EPCA that fuel economy should be measured using testing procedures gauging carbon emissions. *See* 49 U.S.C. § 32904(c); 38 Fed. Reg. 10,868 (May 2, 1973); 85 Fed. Reg. 28,564, 28,567 (May 13, 2020). Under the CAFE test procedures, automobile manufacturers measure automobile fuel economy using a "carbon-balance" method: by measuring carbon per gallon in the test fuel and dividing it by the rate at which carbon is emitted from the tailpipe, manufacturers reliably estimate how fast an automobile is consuming fuel based on how rapidly it

is consuming the fuel's carbon. *See, e.g.*, 40 C.F.R. § 600.113-12(h)(1), (o)(1) (gasoline, E10).

107.    EPA uses the same carbon-based emissions test method to measure compliance with its own carbon-dioxide standards. *See, e.g.*, *id.* § 600.113-12(h)(2), (o)(2) (gasoline, E10).

108.    So does California. *See* Cal. Code Regs. tit. 13, § 1961.3 (incorporating federal test procedures).

109.    Carbon-dioxide emissions typically account for over 99% of all mass-based carbon emissions per mile and depend upon the automobile's fuel efficiency. *See* EPA, *Tailpipe Greenhouse Gas Emissions*, *supra*, at 1 ("The amount of $CO_2$ created from burning one gallon of fuel depends on the amount of carbon in the fuel. Typically, more than 99% of the carbon in a fuel is emitted as $CO_2$ when the fuel is burned. Very small amounts are emitted as hydrocarbons and carbon monoxide, which are converted to $CO_2$ relatively quickly in the atmosphere."); *see* 71 Fed. Reg. at 17,661 ("[C]ompliance with federal fuel economy standards is based primarily on $CO_2$ emission rates of covered vehicles."); *see, e.g.*, 40 C.F.R. pt. 600, App'x II (sample fuel economy measurements).

110.    MPCA itself recognized this direct link, explaining that "[t]he primary way manufacturers reduce [greenhouse-gas] emissions to comply with these standards is to *improve the fuel economy of their vehicles*." SONAR at 72 (emphasis added); *see also id.* at 78 ("[Greenhouse-gas] emissions standards generally result in improvements in fuel economy."); *id.* at 65 (projecting fuel savings from the rules).

111.    District courts addressing EPCA preemption have also recognized this scientific link. A district court addressing California's earlier greenhouse-gas standards found that "there is a mathematical relationship between fuel consumption and carbon dioxide emissions." *Green Mountain Chrysler*, 508 F. Supp. 2d at 342 n.49.

112.    Further, as California explained to EPA, to reduce carbon-dioxide emissions per mile, manufacturers will respond by either adopting technologies for improving the fuel economy of automobiles or by switching to electric vehicles that do not consume fuel on-board. CARB, *California's Advanced Clean Cars Midterm Review*, at ES-17 & tbl. 3 (Jan. 18, 2017), https://perma.cc/4PUK-U6SP; *see also* EPA, EPA-420-R-23-033, *The 2023 EPA Automotive Trends Report* 6–8 (Dec. 2023), https://perma.cc/9XV6-CQNG (lower carbon-dioxide emissions are correlated with higher fuel economy).

113.    Accordingly, because the LEV and ZEV rules adopted by MPCA are designed to limit carbon-dioxide tailpipe emissions from automobiles, both individually and on a fleetwide basis, they are "related to fuel economy standards" and "average fuel economy standards" and are therefore expressly preempted by EPCA. *See, e.g.*, *Metro. Taxicab Bd. of Trade*, 615 F.3d at 157 (holding that EPCA preempted New York's hybrid taxi mandate and explaining that EPCA preempts state rules that "make fuel economy standards essential to the operation of those rules").

114.    It does not matter that MPCA has chosen to label its fuel economy standards as carbon-dioxide standards. Under CAFE, "[s]tate or local fuel economy standards would be preempted, regardless of whether they were in terms of miles per gallon or some other parameter …." S. Rep. No. 93-526, at 66. "States and localities can't skirt the text of broad

preemption provisions by doing indirectly what Congress says they can't do directly." *Cal. Rest. Ass'n*, 65 F.4th at 1056 (emphases omitted).

115.    MPCA's rules are also impliedly preempted because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in creating a uniform national framework for fuel economy regulation. *Arizona v. United States*, 567 U.S. 387, 406 (2012) (citation omitted).

116.    Congress charged NHTSA with setting nationally uniform fuel economy standards at the "maximum feasible" level, after considering enumerated statutory factors. This scheme leaves no room for the state officials—whether in California or Minnesota—to reweigh those statutory factors, or to consider other factors of their own choosing, and reach their own conclusions as to the level of fuel economy automakers' fleets must achieve. *See id.* (a "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy") (citation omitted).

117.    These conclusions apply with equal force to state ZEV mandates as they do to carbon-dioxide emission limits. Because ZEVs are included in calculating automakers' average fuel economy for purposes of compliance with federal fuel economy standards, *see* 49 U.S.C. § 32904(a)(2), state ZEV mandates have a direct and substantial impact on corporate average fuel economy.

118.    State ZEV mandates also conflict with Congress's determination that the "maximum feasible" fuel economy standard should be set without regard to ZEVs. *See id.* §§ 32901(a)(1)(J), (a)(8), 32902(a), (h)(1).

119.    In EPCA, Congress expressly forbade NHTSA to consider the fuel economy of vehicles that run on "alternative fuel[s]" (such as electricity) when setting the "maximum feasible" fuel economy standards. *Id.* In this way, Congress prevented NHTSA from effectively mandating ZEVs by setting standards so stringent that they could only be met by producing such vehicles.

120.    At the same time, Congress created an incentive for ZEVs by allowing manufacturers to include their petroleum-equivalent fuel economy values when calculating their fleetwide average for compliance purposes. *See id.* § 32904(a)(2); *see also Iowa*, 2025 WL 2554549, at *1.

121.    Because Congress directly addressed the role of ZEVs within the federal fuel economy program, a state law that mandates a specific market-share quota for electric vehicles is unequivocally "related to" the federal fuel economy standards and is preempted. By allowing states to supplant Congress's determination and impose a top-down ZEV mandate, the state rules disrupt Congress's careful approach and interfere with NHTSA's balancing of the statutory factors.

122.    MPCA cannot evade EPCA preemption by relying on provisions of the Clean Air Act. While the CAA allows Minnesota to adopt standards for which California has received a waiver from *CAA preemption*, that waiver has no effect on preemption under EPCA.

123.    Congress did not authorize NHTSA or EPA (or anyone else) to waive EPCA preemption. *See, e.g.*, 86 Fed. Reg. at 74,241 ("EPCA is totally silent as to any role for NHTSA in further defining EPCA preemption.").

124.    Indeed, in waiving CAA preemption for the California standards, EPA expressly declined to consider EPCA preemption, explaining that such challenges are appropriately addressed "in court." 87 Fed. Reg. at 14,373. Neither the CAA nor any other law authorizes EPA to waive preemption under EPCA.

125.    MPCA cannot upend Congress's uniform national approach to regulating fuel economy; states "can't skirt the text of broad preemption provisions by doing indirectly what Congress says they can't do directly." *Cal. Rest. Ass'n*, 89 F.4th at 1107 (emphases omitted).

126.    To redress these violations of federal law and the interference with rights of Plaintiffs and their members, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and other provisions of law, including the Supremacy Clause and 42 U.S.C. § 1983, Plaintiffs request a declaration that MPCA's rules are preempted and unenforceable.

127.    The United States Constitution makes federal law and regulations "the supreme Law of the Land." U.S. Const., art. VI, cl. 2. Plaintiffs and their members have legally protected interests under the Constitution, EPCA, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal fuel economy laws against Defendants' enforcement of the challenged rules.

128.    Unless Defendants are enjoined from enforcing the challenged rules, the rules will remain in effect in violation of federal law, will continue to harm Plaintiffs and their members, and will be enforced by Defendants.

129.    Plaintiffs are also entitled to an injunction barring Defendants from enforcing these rules and redressing these violations of federal law under 42 U.S.C. § 1983; *Ex Parte*

*Young*, 209 U.S. 123; and the Supremacy Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that Minn. R. 7023.0150, 7023.0200, 7023.0250, 7023.0300 violate federal law in the manner alleged above;

2. A permanent injunction, pursuant to Federal Rule of Civil Procedure 65, enjoining Defendants from enforcing Minn. R. 7023.0150, 7023.0200, 7023.0250, 7023.0300; and

3. Such other relief available under federal, state, and local law as this Court may deem just and proper, including attorneys' fees and costs of this action to the extent allowed by federal, state, or local law.

Dated: October 15, 2025

*/s/ Michael Buschbacher*
Michael Buschbacher (D.C. 1048432)
(*admitted pro hac vice*)
**BOYDEN GRAY PLLC**
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Attorneys for Plaintiffs Clean Fuels*
*Development Coalition, Minnesota Soybean*
*Growers Association, ICM, Inc., and the*
*Minnesota Service Station & Convenience*
*Store Association*


Gordon D. Todd (D.C. 475203)
(*admitted pro hac vice*)
Manuel Valle (D.C. 1697419)
(*admitted pro hac vice*)
**SIDLEY AUSTIN LLP**
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (facsimile)
gtodd@sidley.com
manuel.valle@sidley.com

*Attorneys for Plaintiff National Association of*
*Convenience Stores*

Thomas H. Boyd, #200517
Tammera R. Diehm, #327566
Kyle R. Kroll, #398433
**WINTHROP & WEINSTINE, P.A.**
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402
(612) 604-6400
tboyd@winthrop.com
tdiehm@winthrop.com
kkroll@winthrop.com

*Attorneys for Plaintiff Minnesota Service*
*Station & Convenience Store Association*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 15, 2025, I caused a copy of this document to be

filed using the CM/ECF system, which will provide notice to all registered counsel.

Dated: October 15, 2025

*/s/ Michael Buschbacher*
Michael Buschbacher (D.C. 1048432)
(*admitted pro hac vice*)
**BOYDEN GRAY PLLC**
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Attorneys for Plaintiffs Clean Fuels*
*Development Coalition, Minnesota Soybean*
*Growers Association*, *ICM, Inc., and the*
*Minnesota Service Station & Convenience Store*
*Association*